## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

versus                                              CRIMINAL NO. 15-83-SDD-EWD

DEMITORIS ALEXANDER

### RULING

This matter is before the Court on the Motion under 28 U.S.C. 2255 to Vacate, Set Aside, or Correct Sentence filed by the Defendant, Demitoris Alexander ("Defendant" or Alexander").[1] The United States ("the Government") has filed an Opposition to this motion.[2]  For the following reasons, Defendant's motion is DENIED.

### I.    PROCEDURAL AND FACTUAL BACKGROUND

Following a jury trial in March 2018, Alexander was convicted of (1) conspiring  to distribute and possessing with intent to distribute five kilograms or more of cocaine, (2) possessing with intent to distribute five kilograms or more of cocaine, and (3) unlawfully using communication facilities.[3] This Court imposed a discretionary life sentence.[4] Alexander appealed his conviction to the Fifth Circuit, which affirmed the opinion of this Court.[5] Alexander timely filed a *pro se* 28 U.S.C. § 2255 motion,[6] which was later supplemented by counsel.[7]

---

[1] Rec. Docs. 1970, 1985.
[2] Rec. Doc. 1997.
[3] Rec. Doc. 1997, p. 1(citing Rec. Doc. 1564).
[4] Rec. Doc. 1687, pp. 16-20.
[5] *See United States v. Alexander*, 782 F. App'x 304, 310 (5th Cir. 2019) (per curiam).
[6] Rec. Doc. 1970.
[7] Rec. Doc. 1985.

## II.    ARGUMENTS

Alexander asserts three ineffective assistance of counsel claims and multiple subclaims in support of his motion. First, Alexander argues that his trial counsel was ineffective for failing to request a jury instruction pertaining to multiple conspiracies because, contrary to the indictment, there were two unrelated conspiracies in this case.[8] Alexander claims that the first conspiracy is the Demitoris Alexander Organization and his crew, and the second is the Kelly Williams Organization, a wholly separate and unrelated entity.[9] Alexander's second claim is based on trial counsel's failure to ask the district court for a jury instruction to clarify when Drug Enforcement Administration ("DEA") Special Agent Lusco was testifying as an expert and when he was testifying as a lay person.[10] His third claim is comprised of a series of ineffective assistance of appellate counsel claims relating predominantly to sentencing issues.[11]

The Government opposes Alexander's claims on several grounds. First, regarding the multiple conspiracy instruction claim, the Government contends trial counsel was not ineffective because there was not sufficient proof for a jury to find two unrelated conspiracies.[12] The Government highlights the fact that Defendant and his organization regularly sold kilogram quantities of cocaine over a continuous period to the Kelly Williams Organization, indicating a working relationship sufficient to constitute a joint conspiracy.[13] Next, as to the jury instruction claim regarding Agent Lusco's testimony, the Government argues this claim fails because Alexander is unable to show how his trial counsel's alleged

---

[8] Rec. Doc. 1985, p. 11.
[9] *Id.*
[10] *Id.* at p. 13.
[11] *Id.* at p. 16.
[12] Rec. Doc. 1997, p. 3.
[13] *Id.*

deficient performance prejudiced his defense.[14] Finally, as to the appellate issues, the Government maintains that the claims fail because Alexander presented no arguments, authority, or evidence that demonstrate a reasonable probability that he would have prevailed on appeal.[15]

## III.    LAW AND ANALYSIS

### A.  Relief under Section 2255

Under 28 U.S.C. § 2255, a federal inmate can file a motion to vacate, set aside, or correct their sentence if, "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." The Fifth Circuit has stated that, "[r]elief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." [16]

"When a § 2255 motion is filed, the district court must first conduct a preliminary review."[17] "If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion."[18] If the motion raises a non-frivolous claim to relief, the court must order the Government to file a response or to take other appropriate action.[19] After reviewing the Government's response along with any other relevant materials, the court must determine

---

[14] *Id.*
[15] *Id.* at p. 4.
[16] *United States v. Acklen*, 47 F.3d 739, 741 (5th Cir. 1995).
[17] *United States v. Hutton*, No.16-184, 2020 WL 5517332, at *2 (E.D. La. Sep. 14, 2020).
[18] Rules Governing § 2255 Proceedings, Rule 4(b).
[19] *Id.*

whether an evidentiary hearing is warranted.[20]   An evidentiary hearing must be held "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."[21] No evidentiary hearing is required, however, if the prisoner fails to produce any "independent indicia of the likely merit of [his] allegations."[22]

When a defendant has exhausted his right to appeal, his conviction and sentence are presumed to be fair and final.[23] Therefore, an issue raised for the first time in a motion pursuant to 28 U.S.C. § 2255 will be considered only if the defendant shows "cause" for his failure to previously raise the issue and "actual prejudice" resulting from the alleged error.[24] Vague or conclusory allegations are insufficient to raise a claim under 28 U.S.C. § 2255.[25]

### B.  Ineffective Assistance of Counsel

*Strickland v. Washington* articulates the standard for this claim.[26] In *Strickland*, the Supreme Court held that, to obtain relief, a defendant must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense.[27] A deficient performance is one in which the attorney's actions were unreasonable under prevailing professional norms.[28]  A defendant must prove both prongs to succeed in an ineffective assistance of counsel claim.[29]

---

[20] Rules Governing § 2255 Proceedings, Rule 8.
[21] 28 U.S.C. § 2255(b).
[22] *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006) (quoting *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998)).
[23] *United States v. Frady*, 456 U.S. 152,164 (1982); *United States v. Shaid*, 937 F.2d 228, 231-32 (5th Cir. 1991)(en banc).
[24] *Frady*, 456 U.S. at 167-68; *Shaid*, 937 F.2d at 232.
[25] *United States v. Pineda*, 988 F.2d 22, 23 (5th Cir. 1993).
[26] *Strickland v. Washington*, 466 U.S. 668 (1984).
[27] *Id.* at 687.
[28] *Id.* at 688.
[29] *Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir. 1997).

To prevail on the deficiency prong, a petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment.[30] "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness."[31]  In analyzing counsel's performance, a reviewing court must take into account the reasonableness of counsel's actions under prevailing professional norms and in light of all of the circumstances.[32] The reviewing court must "judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."[33] Furthermore, a petitioner must overcome a strong presumption that defense counsel's conduct falls within a wide range of reasonable representation.[34] "[I]t is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight."[35]  "Judicial scrutiny of counsel's performance must be highly deferential," and the court must make "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."[36] With these principles in mind, federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise.[37]

---

[30] *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001).

[31] *Strickland*, 466 U.S. at 688.

[32] *Id*. at 689; *Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009).

[33] *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000)(quoting *Strickland*, 466 U.S. at 690).

[34] *Harrington v. Richter*, 562 U.S. 86, 104 (citing *Strickland*, 466 U.S. at 689).

[35] *Bell v. Cone*, 535 U.S. 685, 702 (citing *Strickland*, 466 U.S. at 689).

[36] *Strickland*, 466 U.S. at 689.

[37] *Id.*; *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004)(counsel's "'conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'")(quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002)); *Geiger v. Cain*, 540 F.3d 303, 309 (5th Cir. 2008).

Prejudice occurs when there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different.[38] A reasonable probability is one that is sufficient to undermine confidence in the outcome.[39] Furthermore, "[t]he petitioner must 'affirmatively prove,' not just allege, prejudice."[40] This standard requires a "substantial," not just "conceivable," likelihood of a different result.[41] In making this determination as to prejudice, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."[42] Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief.[43]

Regarding counsel's failure to request a multiple conspiracy instruction, several Fifth Circuit decisions provide guidance. In *United States v. Cavin*, the court held that, "[u]pon request, a defendant is entitled to [a multiple conspiracy] instruction if his theory of multiple conspiracies has a legal basis and is supported by sufficient evidence to raise a factual question for the jury."[44] If no such factual support is provided, then an ineffective assistance claim based on counsel's failure to request a multiple conspiracies instruction is without merit, as counsel's conduct could not be considered unreasonable if there was no viable strategic purpose in making such a request.[45]

---

[38] *See United States v. Haese*, 162 F.3d 359, 364 (5th Cir. 1998).
[39] *Strickland*, 466 U.S. at 694.
[40] *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009) (quoting *Strickland*, 466 U.S. at 693).
[41] *Harrington v. Richter*, 562 U.S. 86, 112 (2011).
[42] *Crockett v. McCotter*, 796 F.2d 787, 793 (5th Cir. 1986).
[43] *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000)(citing *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).
[44] *United States v. Cavin*, 39 F.3d 1299, 1310 (5th Cir. 1994).
[45] *See United States v. Devine*, 68 F.3d 468, 1995 WL 581639 at *1 (5th Cir. 1995).

1.  Failure to Request a Multiple Conspiracy Charge

Alexander argues his conviction was caused by trial counsel's unreasonable failure to request a multiple conspiracy instruction.[46]  Though Alexander does not specifically state that this decision constituted a constitutional deficiency—the first prong of the *Strickland* analysis—his use of the phrase "unreasonable" comports with the objective standard of reasonableness courts utilize in determining whether this first component is satisfied. While it is true that this unreasonableness standard is a stringent one, both *Strickland* and its progeny provide that excessive deference is not required when an examination of trial counsel's decisions indicates no plausible strategic purpose.[47]

To prevail on this claim, Alexander must show that such an instruction was legally warranted; thus, his counsel's failure to do so to constitutes unreasonableness.[48] A defendant is entitled to a multiple conspiracy instruction if the theory of multiple conspiracies has a legal basis and is supported by sufficient evidence to raise a factual question for the jury.[49] The evidence provided must first show that an actual variance exists between the allegations in the indictment and the proof at trial.[50] If such a variance is proven, a defendant must next show that prejudice flowed from this variance such that it affected the defendant's substantial rights.[51] The Fifth Circuit noted that "where the

---

[46] Rec. Doc. 1985, p. 9 (citing *Hinton v. Alabama*, 571 U.S. 263, 272-274 (2014)).
[47] *Id.* (citing *Moore v. Johnson*, 194 F.3d 586, 617 (5th Cir. 1999); *Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987) ("*Strickland* does not require deference to trial counsel's choices 'when there is no conceivable strategic purpose that would explain counsel's conduct'…*Strick*land does not require the habeas court to 'condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decisions at all.'")).
[48] *Se United States v. Devine*, 68 F.3d 468, 1995 WL 581639 at *1 (5th Cir. 1995).
[49] *Cavin*, 39 F.3d at 1310.
[50] *U.S. v. Carbajal*, 290 F.3d 277, 291 (5th Cir. 2002), citing *United States v. Morris*, 46 F.3d 410, 414 (5th Cir. 1995)).
[51] *Id.*

indictment alleges a single conspiracy and the evidence establishes each defendant's participation in at least one conspiracy[,] a defendant's substantial rights are affected only if the defendant can establish reversible error under general principles of joinder and severance."[52] Thus, even if a multiple conspiracy instruction is viable, Alexander must prove that there is a reasonable probability that the outcome at trial would have been different if this instruction had been given.[53]

Alexander maintains that the Demitoris Alexander Organization and the Kelly Williams Organization were largely unrelated aside from the fact that the Alexander Organization was one of three groups supplying narcotics to the Kelly Williams Organization.[54] To minimize the extent of this business relationship, Alexander notes that all transactions were cash and carry, and there was no interdependence between the two organizations.[55]

To demonstrate the prejudicial effect his trial counsel's failure to request the instruction had on his defense—the second component of the *Strickland* analysis—Alexander points to multiple instances in Agent Lusco's testimony in which he discussed the violent acts carried out by the Kelly Williams Organization.[56] Alexander argues that the joinder of the two conspiracies allowed the Government to improperly suggest Alexander's propensity to violence based on the violence of the Kelly Williams Organization.[57] In arguing that his trial would have turned out differently absent this prejudicial defect, Alexander asserts that, had the instruction been requested, "there was

---

[52] *Id.* (quoting *United States v. Pena-Rodriguez*, 110 F.3d 1120, 1128 (5th Cir. 1997)).
[53] *Id.*
[54] Rec. Doc. 1985, p. 11.
[55] *Id.*
[56] *Id.* at 12.
[57] *Id.*

a reasonable probability of acquittal of the single conspiracy charged in the indictment, and acquittal of the substantive drug charge based on the prejudicial spillover from the evidence of violence that came from joinder of the two separate and unrelated conspiracies."[58]

In analyzing this claim, the Court must first determine whether Alexander was entitled to such an instruction at all.[59] To demonstrate this entitlement, Alexander must show that there existed a significant factual basis to raise a question for the jury.[60] Alexander attempts to provide this factual basis through the assertion that, despite the fact that there were repeated drug transactions between the Organizations, there was no interdependence between the two.[61] Further, Alexander notes that all drug transactions were cash and carry, seemingly indicating that there was no greater relationship beyond a few brief exchanges.[62]

However, an examination of the trial record, which details the extensive dealings of the two organizations, indicates a much closer working relationship. For example, multiple witnesses testified to the fact that, at one time, various members of the Alexander Organization regularly sold large quantities of cocaine to members of the Williams Organization.[63] In particular, Williams testified that "he purchased over ten kilograms [of cocaine] from Alexander's group in 2013 over several transactions and that the Williams

---

[58] *Id.*
[59] *United States v. Cavin*, 39 F.3d 1299, 1310 (5th Cir. 1994); *see Devine*, 68 F.3d 468, 1995 WL 581639 at *1 (5th Cir. 1995).
[60] *Cavin* 39 F.3d at 1310 ("Upon request, a defendant is entitled to such an instruction if his theory of multiple conspiracies has a legal basis and is supported by sufficient evidence to raise a factual question for the jury.").
[61] Rec. Doc. 1985, p. 11.
[62] *Id.*
[63] *See* Rec. Doc. 1680, pp. 194-196, 227-235; Rec. Doc. 1679, pp. 32-36, 40, 46-47, 70-78, 141-142.

group was distributing multiple kilograms of cocaine a week."[64] Moreover, C'Prien Nicholas ("Nicholas"), Alexander's "right-hand-man," testified that in 2013, he was selling cocaine on behalf of Alexander, and he was selling cocaine to the Williams Organization "[every day] or every other day."[65] Finally, Nicholas testified that on at least one occasion, he allowed a member of the Williams Organization to walk away with $15,000 worth of cocaine without fully paying so that a customer could test its quality.[66] After the customer reported that the product was of poor quality, Nicholas allowed the Williams crew member to return the cocaine.[67] This arrangement was allowed because the Williams Organization was a frequent customer of the Alexander Organization and because Alexander knew that specific member of the Williams Organization personally.[68]

Although the Alexander Organization and Williams Organization were distinct groups in some ways, this in no way precludes a finding that both were involved in a single conspiracy. A single conspiracy, as opposed to multiple conspiracies, is "'one overall agreement' to perform various functions to achieve the conspiracy's objectives."[69] As is noted by the Fifth Circuit in *United States v. Rodriguez*, "[c]onspiracy law contemplates the existence of subgroups … [p]rovided that there is an overall agreement with consistent ultimate purposes, subagreements are in no way inconsistent with a conspirator's liability."[70] Moreover, "the existence of a single conspiracy will be inferred where the activities of one aspect of the scheme are necessary or advantageous to the

---

[64] Rec. Doc. 1997, p. 8(citing Rec. Doc. 1680, pp. 194-196, 227-235).
[65] Rec. Doc 1679, pp. 32-36, 40, 46-47, 70-78, 141-142.
[66] Rec. Doc. 1681, pp. 42-44.
[67] Rec. Doc. 1997, p. 9 (citing Rec. Doc. 1681, pp. 42-44; Rec. Doc. 1639, p. 3).
[68] Rec. Doc. 1681, p. 43.
[69] *United States v. Shabani*, 48 F.3d 401, 403 (9th Cir. 1995)(citing *United States v. Patterson*, 819 F.2d 1495, 1502 (9th Cir. 1987)).
[70] *United States v. Rodriguez*, 553 F.3d 380, 391, n.4 (5th Cir. 2008)(citing *Shabani*, 48 F.3d at 403).

success of another aspect or to the overall success of the venture, where there are several parts inherent in a larger common plan."[71] To be sure, both the Alexander and Williams Organizations relied upon one another to a large extent to advance the operations of their respective drug enterprises. The repeated nature of their drug transactions alone evidenced this fact.   Relying on Fifth Circuit precedent, the Government argues that the two groups were part of the same overarching conspiracy because "the evidence showed 'that the defendants had a common goal of distributing illegal drugs for profit, that they knew they were part of a larger venture, and that the activities of each conspirator were advantageous to the success of the overall venture.'"[72] The Court finds that the trial evidence overwhelmingly supports the Government's assertion.

Moreover, even if the evidence supported Alexander's argument that the two organizations were wholly distinct, it is likely that Alexander's interactions with the Williams Organization legally bound the two together. Through his leadership, Alexander allowed a member of the Williams Organization to walk away with a large quantity of cocaine without fully paying and later allowed that same member to return the drugs because of their poor quality.[73] As the Fifth Circuit noted, "[w]hen a wholesaler attempts to cultivate a repeat customer by offering a return policy to a purchaser who he knows will resell the merchandise, the wholesaler takes an interest in the success of the customer's resale business…."[74] Thus, not only did Alexander have a stake in the success of his own

---

[71] *United States v. Morris*, 46 F.3d 410, 416 (5th Cir. 1995).
[72] Rec. Doc 1997, p. 7 (citing *United States v. Jones*, 969 F.3d 192, 197 (5th Cir. 2020)).
[73] Rec. Doc 1681, pp. 42-44.
[74] *United States v. Delgado*, 672 F.3d 320, 333 (5th Cir. 2012) (en banc).

drug enterprise, but he also had a direct interest in the success of the Williams Organization's operation as well.

Alexander points to the fact that the two Organizations had different members and followed a different hierarchal structure.[75] Alexander does not, however, refute any of the facts cited above which evidence a continued working relationship built on a substantial level of trust between the two groups. Hence, even if multiple conspiracies were in fact present in this matter, Alexander failed to sufficiently provide evidence to support this assertion. Accordingly, the Court cannot conclude that Alexander's trial counsel was ineffective for failing to request a multiple conspiracy instruction when the evidence provided does not indicate that Alexander was entitled to one.

Because the first prong of the *Strickland* analysis has not been satisfied, there is no need to determine whether Alexander showed sufficient prejudice. Nevertheless, the prejudice component of the *Strickland* analysis requires Alexander to show a reasonable probability that he would have been acquitted but for the failure to request the multiple conspiracy instruction.[76] The first portion of Alexander's prejudice argument is that, had there been a multiple conspiracy instruction, there was a reasonable probability of acquittal of the single conspiracy charged in the indictment.[77] However, the above cited excerpts from the trial record tying the activities of the Alexander Organization to the Williams Organization render this assertion unpersuasive.

Alexander's second prejudice argument is that the instruction would have resulted in an acquittal of the substantive drug charge based on the prejudicial spillover from the

---

[75] Rec. Doc. 1985, pp. 11-12.
[76] *Strickland*, 466 U.S. at 694.
[77] Rec. Doc. 1985, p. 12.

evidence of violence that came from the joinder of the two conspiracies.[78] But the evidence of violence Alexander refers to was presented only in connection with the trial of his codefendant Colin Knox ("Knox"), a member of the Williams Organization.[79] Alexander fails to show how the violence of the Williams Organization had any prejudicial effect on the wealth of evidence establishing Alexander's substantive drug charges, and Alexander makes no attempt to sufficiently explain this alleged prejudicial effect. Critically, on Alexander's appeal, the Fifth Circuit found that the evidence presented at trial was more than sufficient to support his substantive drug count.[80] Thus, the Court is unpersuaded that testimony relating to the violence of the Williams Organization materially influenced the jury's verdict as to Alexander's substantive drug count, considering the ample evidence directly establishing his guilt.  Alexander has failed to satisfy his burden of showing that his trial would have turned out differently had the multiple conspiracy charge been given.[81] Accordingly, this ineffective assistance claim is without merit.

### 2.  Failure to Request Jury Instruction Regarding Lusco's Testimony

Alexander's second ineffective assistance claim is that his trial counsel was ineffective by failing to request a jury instruction to assist the jury in evaluating DEA Special Agent Mark Lusco's testimony, particularly in distinguishing when he was testifying as an expert, when he was testifying as a layperson, and when he was acting as a summary witness, "repeating and bolstering the testimony of the army of criminals

---

[78] *Id.*
[79] Rec. Doc. 1997, p. 14.
[80] *United States v. Alexander*, 782 F.App'x 304, 307-308 (5th Cir. 2019).
[81] *Strickland* , 466 U.S. at 694; *Carbajal*, 290 F.3d at 291; *Pena-Rodriguez*, 110 F.3d at 1128.

who were testifying against [Alexander] for benefits."[82]  Agent Lusco—the Government's first witness—was accepted as an expert in the "field of the technology, methods and terminologies employed for the purposes of drug trafficking."[83] Although Agent Lusco was qualified as an expert, many of the Government's questions called for lay testimony as well.[84] Alexander contends the Court should have acted as a gatekeeper in advising the jury of the differences between these two types of testimony.[85] Alexander maintains that, due to this omission by the Court, his trial counsel should have requested and instruction and was constitutionally ineffective for failing to do so.[86] Alexander fails to direct the Court to the specific pattern jury instruction or statement of law he claims should have been given to remedy this purported error.

In support of this claim, Alexander relies on appellate decisions outside the Fifth Circuit. He cites to *United States v. Williams*, decided by the D.C. Circuit, in which the court reversed a defendant's conviction because an expert in the case gave expert opinion and lay opinion without describing the basis for his opinion.[87] In *Williams*, an FBI agent provided lay opinion testimony "interpreting recorded conversations and other interactions between the alleged co-conspirators that he had listened to or observed during the FBI's investigation, and expert testimony on 'the interpretation of words and phrases used by drug traffickers.'"[88] The appellate court exercised direct review, requiring the United States to show harmlessness if any error occurred.[89]

---

[82] Rec. Doc. 1985, p. 13.
[83] Rec. Doc. 1692, p. 33.
[84] *See* Rec. Docs. 1692 and 1693.
[85] Rec. Doc. 1985, p. 14.
[86] *Id*. at pp. 13-15.
[87] *United States v. Williams*, 827 F.3d 1134, 1159 (D.C. Cir. 2016).
[88] *Id*. at 1157.
[89] *Id*.

The *Williams* court ultimately determined that the lay opinion testimony given by the FBI agent, where he interpreted recorded conversations and interactions between co-conspirators, was inadmissible based on the agent's failure to provide a complete and accurate statement of the bases on which he relied.[90] The court reached this conclusion despite the fact that, at some points during the agent's testimony, the prosecutor's questions listed evidence which the agent purportedly reviewed to form his lay opinion, finding that the agent nevertheless did not establish a specific factual basis for his opinions.[91] In concluding that this error was not harmless, the appellate court reversed the defendant's conviction.[92]

Conversely, in *United States v. Haines*, the Fifth Circuit reached a different conclusion in its analysis of whether the intermingling of a DEA agent's lay and expert testimony was permissible.[93] In *Haines*, the DEA agent testified as an expert, interpreting the meaning of specific codewords and terms commonly used in the drug trade, and also as a layperson, interpreting wiretap communications between the case's co-conspirators.[94] The Fifth Circuit held that the DEA agent's lay testimony interpreting the meaning of specific words and terms used in the wiretaps was admissible testimony.[95] The court concluded that the lay testimony was based on the agent's familiarity with the case rather than his expertise with the drug trade.[96]

Both cases present facts similar to those herein regarding Agent Lusco's expert qualifications and testimony in the explanation of terms commonly used in the drug trade.

---

[90] *Id.* at 1157-59.
[91] *Id.*
[92] *Id.*
[93] *United States v. Haines*, 803 F.3d 713 (5th Cir. 2015).
[94] *Id.*
[95] *Id.*
[96] *Id.*

Additionally, the content of his lay testimony included the interpretation of wiretap communications between co-conspirators. As noted above, courts have reached different conclusions in determining how much information a witness must provide to establish a sufficient factual basis for their lay testimony. Nonetheless, this Court is bound to follow the Fifth Circuit's reasoning and analysis. Further, Alexander's claims are directly contradicted by the record.

As the Government points out, the jury was frequently told about the capacity in which Special Agent Lusco was testifying. There were several instances where the prosecutor phrased her questions to specifically elicit only expert opinion testimony (*i.e.* knowledge obtained by working many other drug trafficking cases and based on knowledge of the drug trade generally) or only lay opinion testimony (*i.e.* testimony based on personal knowledge of this conspiracy).[97] In fact, Knox's trial counsel was critical of how many times the prosecutor prefaced a question by essentially calling for a lay opinion.[98] When defense counsel objected regarding the distinctions between the two categories of testimony, the Court timely ruled on them, thereby performing its gatekeeping function.[99]  For example, the prosecutor asked "Agent Lusco, as an expert interpretation of language used by drug dealers, in your opinion what do you think spooked when you see the right ends walking around, when you see the right ends coming out means?"[100] Knox's trial counsel objected, arguing that the question called for speculation, but the Court permitted Agent Lusco to answer if he could.[101]

---

[97] *See* Rec. Doc. 1677, pp.76–77 (expert opinion); pp. 52, 69, 77 (lay opinion); Rec. Doc. 1678, pp. 8, 29 (lay opinion); *see also United States v. Staggers*, 961 F.3d 745, 760–761 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 388 (2020) (explaining the difference between lay and expert testimony in this area).
[98] Rec. Doc. 1678, p. 84.
[99] Rec. Doc. 1677, pp. 56–57, 67, 75–77.
[100] *Id*. at p. 76.
[101] *Id*. at pp. 76–77.

The Government also contends this claim is not viable under Section 2255.  The Supreme Court has noted that a "collateral challenge may not do service for an appeal."[102] Once a defendant is convicted and exhausts or waives his/her right to appeal, courts "are entitled to presume that [the defendant] stands fairly and finally convicted."[103] Defendants are entitled to challenge their convictions after they are presumed final, and then only on issues of constitutional or jurisdictional magnitude, "and may not raise an issue for the first time on collateral review without showing both 'cause' for his procedural default, and 'actual prejudice' resulting from the error."[104] To meet this standard, the Supreme Court holds that criminal defendants bear the "burden of showing not just the 'possibility of prejudice as a result of the instructional error,' but an 'actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."[105] Alexander claims that Agent Lusco's testimony tainted his entire trial; however, he raises the purported plain error only in the context of his trial counsel's alleged ineffective assistance in failing to remedy the error.[106] Thus, Alexander's plain error arguments are procedurally barred under Section 2255 since *Strickland* is the applicable standard.

Under *Strickland*, Alexander must show that his trial counsel's performance as to this issue was constitutionally deficient and this deficiency prejudiced his defense.[107] It has "long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment."[108] Thus, even if trial counsel should have objected to Agent Lusco's testimony, Alexander must demonstrate that trial

---

[102] *United States v. Frady*, 456 U.S. 152, 165 (1982).
[103] *United States v. Shaid*, 937 F.2d 228, 231-32 (5th Cir. 1991)(quoting *Frady*, 456 U.S. at 164).
[104] *Shaid*, 937 F.2d at 232 (citing *Hill v. United States*, 368 U.S. 424, 428 (1962); *Frady*, 456 U.S. at 168).
[105] *Shaid*, 937 F.2d at 233 (quoting *Frady*, 456 U.S. at 170).
[106] Rec. Doc. 1985, p. 15.
[107] *Strickland*, 466 U.S. at 694.
[108] *United States v. Addonizio*, 442 U.S. 178, 184 (1979).

counsel made "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[109] As discussed above, this unreasonableness standard is a high burden to satisfy, and deference is generally given to trial counsel's strategic decisions.[110] But even assuming Alexander could clear this hurdle, he must also satisfy the prejudice requirement.

*Strickland's* prejudice component requires Alexander to show how any jury instruction or trial counsel's objection to Agent Lusco's testimony would have made a difference in the outcome of his trial.[111] Alexander's argument is primarily that his counsel should have objected to Agent Lusco's interpretations of the Title III wiretap, which Alexander claims was not supported by an objective factual basis for lay testimony or fell outside the scope of his expertise as an expert witness.[112] But even if Agent Lusco's testimony had been limited or excluded, the evidence offered at trial as to Alexander's guilt undermines his argument that the trial outcome would have been different. The Title III wiretaps recordings were deemed admissible at a pre-trial hearing,[113] and the contents of those recordings would still have been presented to the jury. Further, several co-conspirators whose voices were heard in the recordings also testified as to the veracity of their words and what they meant.[114] Aside from Agent Lusco's testimony and seven co-conspirators, other law enforcement officers and a scientific expert also testified on behalf of the Government.[115] The Court finds that a vast amount of evidence presented at trial, even absent Agent Lusco's testimony, supported Alexander's guilty verdict. Thus,

---

[109] *Strickland*, 466 U.S. at 687
[110] *Id.* at 691.
[111] *Id.* at 694.
[112] Rec. Doc. 1985, pp. 14-16.
[113] Rec. Doc. 1685, p. 29.
[114] Rec. Doc. 1695, pp. 182-262
[115] Rec. Doc. 1997, p. 31.

the Court cannot conclude that Alexander has satisfied the prejudice prong of *Strickland*, and this ineffective assistance claim is without merit.

### 3. Ineffective Assistance of Appellate Counsel

Criminal defendants are entitled to effective assistance of counsel in their first appeal of right.[116] The *Strickland* standard also applies to claims of ineffective appellate counsel.[117] To prevail on a claim that appellate counsel was constitutionally ineffective, a petitioner must show that appellate counsel unreasonably failed to discover and assert a nonfrivolous issue and must establish a reasonable probability that petitioner would have prevailed on this issue on appeal but for counsel's deficient representation.[118]

Effective appellate counsel is not required to assert every nonfrivolous available ground for appeal.[119] To the contrary, the United States Supreme Court has long recognized that appellate counsel filing a merits brief need not and should not argue every nonfrivolous claim; rather, appellate counsel may legitimately select from among the claims in the exercise of professional judgment to maximize the likelihood of success on appeal.[120] Further, appellate counsel has the discretion to exclude a nonfrivolous issue if counsel concludes that issue was unlikely to prevail.[121] Accordingly, because appellate

---

[116] *Evitts v. Lucey*, 469 U.S. 387, 394 (1985).

[117] *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1997).

[118] *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001); *Smith*, 528 U.S. at 285-86.

[119] *Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir. 1998)(citing *Evitts*, 469 U.S. at 394).

[120] *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983).

[121] *See Anderson v. Quarterman*, 204 F. App'x 402, 410 (5th Cir. 2006) ("The issues that Anderson argues his counsel should have raised on direct appeal ... lack merit. As such, failure to raise these issues did not prejudice Anderson."); *Penson v. Ohio*, 488 U.S. 75, 83-84 (1988) (noting that courts have refused to find counsel ineffective when the proposed appellate issues are meritless); *Kossie v. Thaler*, 423 F. App'x 434, 437 (5th Cir. 2011) (recognizing the Supreme Court's basic rule that the presumption that appellate counsel was effective will be overcome only when the claims not asserted are stronger than those that were in fact raised).

counsel is obligated to focus on those arguments that are most likely to succeed, counsel will not be found constitutionally ineffective for failure to assert every conceivable issue.[122]

"Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."[123] Indeed, appellant counsel's restraint often benefits the client because "[a] brief that raises every colorable issue runs the risk of burying good arguments. . . in a verbal mound made up of strong and weak contentions."[124] Thus, the applicable test in assessing such a claim is whether the issue ignored by appellate counsel was "clearly stronger" than the issues actually presented on appeal.[125]

Alexander's third ineffective assistance of appellate counsel claim is comprised of a series of alleged deficient actions by his appellate counsel.[126] First, he claims appellate counsel was ineffective in failing to brief the claim that the evidence at trial was insufficient to prove the single conspiracy alleged in the indictment.[127] Alexander's argument here is essentially based on the same underlying grounds he asserted against trial counsel. Alexander contends appellate counsel should have argued that the trial evidence established that the Williams Organization was not involved in the Alexander conspiracy.[128] Although he does not specifically argue prejudice, Alexander maintains that "[t]he participants were different…[t]he drug sources were different…[and] [t]he

---

[122] *Smith*, 528 U.S. at 288; *Jones*, 463 U.S. at 754.
[123] *Jones*, 463 U.S. at 751-52.
[124] *Id.* at 753.
[125] *See, e.g., Diaz v. Quarterman*, 228 F. App'x 417, 427 (5th Cir. 2007); *accord Smith*, 528 U.S. at 288.
[126] Rec. Doc. 1985, p. 16.
[127] *Id.*
[128] *Id.*

crimes were different."[129] As discussed above, Alexander must show prejudice. The Court has already held that he has failed to do so regarding this claim based on the wealth of evidence supporting his convictions. The Court cannot conclude that, but for appellate counsel's unreasonable failure to brief this issue on appeal, he would have prevailed on appeal.[130] Likewise, Alexander has failed to establish that this claim is clearly stronger than those issues briefed by appellate counsel.

Next, Alexander contends his appellate counsel was ineffective in failing to argue on appeal that the drug quantity attributed to him "was not supported by a preponderance of reliable evidence," which in turn caused the Fifth Circuit to consider that issue waived.[131] The root of this argument is the fact that the Government attributed only 125 kilograms of cocaine to Nicholas, Alexander's "right-hand-man," but attributed 240 kilograms of cocaine to Alexander.[132] Alexander argues that if Nicholas was responsible for 125 kilograms, he should only be held responsible for 125 kilograms as well.[133]

The Government counters that an explanation for this discrepancy is already part of the record.[134] Prior to trial, the Government entered into a proffer agreement and plea agreement with Nicholas wherein it agreed not to use the statements Nicholas made in furtherance of those agreements against him.[135] As part of those agreements, 125

---

[129] *Id.*
[130] *Smith v. Robbins*, 528 U.S. 259, 285 (2000)("[H]e must show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal … [I]t is no harder for a court to apply *Strickland* in this area than it is when a defendant claims that he received ineffective assistance of appellate counsel because his counsel, although filing a merits brief, failed to raise a particular claim …[I]n both cases…the prejudice analysis will be the same.").
[131] Rec. Doc. 1985, p. 16.
[132] *Id.*; Rec. Doc. 1616 (SEALED PSR).
[133] *Id.*
[134] Rec. Doc. 1997, pp. 32-33.
[135] Rec. Doc. 1679, pp. 181-183.

kilograms of cocaine were attributed to Nicholas.[136] But weeks before trial, Nicholas informed the Government that he actually dealt 350 to 400 kilograms of cocaine within the timeframe of the conspiracy.[137] The Government maintains that, while it could not use Nicholas's testimony against him based on the agreements, it was legal to use that information against Alexander.[138]

At his sentencing hearing, the Court found that the evidence presented at trial supported the finding in the Pre-Sentence Investigation Report ("PSR") that Alexander was responsible for at least 240 kilograms of cocaine.[139] This finding was based on Alexander's and his co-conspirator's testimony, both of which indicated that even more cocaine was likely trafficked than what was calculated in the PSR's estimation.[140] Critically, Alexander fails to present any testimony or evidence to challenge these quantities or undermine the Court's reliance thereupon. This failure alone negates a determination that this issue was clearly stronger than the issues his appellate counsel elected to brief.

Alternatively, the Government points out that, even if Alexander's drug quantity was reduced to 125 kilograms, his sentencing guideline range would remain the same.[141] If only 125 kilograms had been attributed to Alexander, "it would have reduced his base offense level from 36 to 34."[142] When combining Alexander's base offense level of 36 from the present indictment with his prior convictions, his total offense level equaled 46.[143]

---

[136] Rec. Doc. 1997, p. 32.
[137] *Id.*
[138] *Id.*
[139] *Id.* at p. 33
[140] *Id.* at pp. 32-33 (citing Rec. Doc. 1687, pp. 6-8).
[141] Rec. Doc. 1997, p. 33.
[142] *Id.* (citing Rec. Doc. 1616, p. 17; U.S.S.G. § 2D1.1(c) (2016)).
[143] *Id.*

Pursuant to U.S.S.G. § 2D1.1, the highest base offense level attributable to defendants like Alexander, who are charged with trafficking and conspiracy offenses, is 43.[144] As such, Alexander's total offense level was reduced to comply with the statutory limits.[145] Thus, because a reviewing court would employ the same sentencing calculations regardless of a drug quantity reduction, this claim is futile, and this ineffective assistance claim is without merit.

Third, Alexander claims his appellate counsel should have challenged on appeal the two-level increase he received for possession of a firearm since there was no evidence that the unidentified person was holding a firearm, and in turn, no evidence that Alexander presented a credible threat of violence.[146] This sentencing enhancement was based on an account contained in the PSR from a confidential source who stated that Alexander directed another to place the barrel of a gun on the source's head.[147] Alexander reportedly told the gunman to "do it," who then pulled the trigger of the unloaded weapon.[148]

While Alexander argues no evidence was presented to establish that a real gun was used, he provides no affirmative evidence to dispute the determination in the PSR that the gun was real. Moreover, as the Fifth Circuit noted in *United States v. Harris*, "[w]hen faced with facts contained in the PSR that are supported by an adequate evidentiary basis with sufficient indicia of reliability, a defendant must offer rebuttal evidence demonstrating that those facts are 'materially untrue, inaccurate or

---

[144] U.S.S.G. § 2D1.1(a) (2016).
[145] Rec. Doc. 1997, p. 33 (citing Rec. Doc. 1639, p. 7; Rec. Doc. 1616, p. 20).
[146] Rec. Doc. 1985, p. 16.
[147] Rec. Doc. 1997, p. 34.
[148] *Id.*

unreliable.'"[149]  Even if Alexander is correct in stating that there was insufficient evidence to show that the gun was real, if "no testimony or other evidence was submitted to rebut the information in the PSR, [a] district court [is] free to adopt the PSR's findings without further inquiry or explanation."[150] Alexander presented no such contradictory evidence, so his argument that appellate counsel was deficient in failing to present this issue on appeal is without merit.

Alexander also argues no evidence supported the credible threat of violence enhancement, and appellate counsel was deficient for not presenting this challenge on appeal. Even if evidence was present to suggest the gun was not real, the firearm sentencing enhancement at issue focuses on the credibility of the threat **from the point of view of the victim**.[151] Further, Alexander wholly ignores evidence of a second threat relating to a courier that independently warranted this enhancement.  Finally, even if the two-point sentence enhancement was removed from Alexander's total offense level, it would remain at the statutory maximum of 43.[152] Thus, this claim is also futile and without merit.

    4.  <u>Remaining Claims</u>

Alexander also asserts, in conclusory fashion, a few other claims related to sentencing: (1) there was no evidence he was the leader or organizer (and there is

---

[149] *United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012)(citing *United States v. Huerta*, 182 F.3d 361, 364-65 (5th Cir. 1999)).
[150] *United States v. Rodriguez*, 602 F.3d 346, 363 (5th Cir. 2010).
[151] U.S.S.G. § 2D1.1(b)(2) (2016); *United States v. Harris*, 578 F. App'x 451, 453 (5th Cir. 2014) (per curiam) ("The enhancement focuses on the threat being 'credible'…[which] is naturally read to mean 'believable.'"); Black's Law Dictionary 448 (10th Ed. 2014) (defining "*credibility*" as "[t]he quality that makes something (as witness or some evidence) worthy of belief"). *United states v. Barrera*, 697 F. App'x 373, 374 (5th Cir. 2017) (per curiam) ("Additional evidence showed that [defendant] issued a death threat to an informant, and [defendant] can only speculate that the target of the threat did not find the threat credible.").
[152] Rec. Doc. 1997, p. 33 (citing Rec. Doc. 1687, pp. 9-10).

unspecified evidence that his son set drug prices), (2) there is no evidence that Alexander maintained premises for drug trafficking, and (3) there is no evidence that Alexander obstructed justice.[153]

The Court noted at Alexander's sentencing that the trial evidence "resoundingly established" that Alexander was a leader in this conspiracy.[154] Although Alexander claims there is evidence showing that his son set the prices for the cocaine, he fails to identify where this evidence can be found.[155] Further, the trial record undermines this claim.[156] Finally, Alexander's last two arguments, regarding enhancements for obstructing justice and maintaining premises for drug trafficking,[157] are wholly meritless because Alexander did not receive those sentencing enhancements.[158]

## IV.    CONCLUSION

For the foregoing reasons, Alexander's Motion under 28 U.S.C. 2255 to Vacate, Set Aside, or Correct Sentence is DENIED.[159]

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 15th day of February, 2024.

_Shelly D. Dick_

**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[153] Rec. Doc. 1970.
[154] Rec. Doc. 1687, pp. 11–12.
[155] Rec. Doc. 1970, p. 5.
[156] *See, e.g.*, Rec. Doc. 1635, pp. 58, 74–77, 204–206; Rec. Doc. 1640, pp. 230–233.
[157] Rec. Doc. 1970, pp. 5, 7.
[158] *See* Rec. Doc. 1616, p. 20, Rec. Doc. 1639, pp. 6–7; Rec. Doc. 1687, p. 10.
[159] Rec. Doc. 1970.